GARSED v. BEALL ET AL.

This case involves only disputed questions of fact. It was heard here upon the pleadings, proofs, and the findings of the jury, in response to the issues sent down to be tried at law. *Held*, that issues of the kind are properly directed where such questions are involved in great doubt by conflicting or insufficient evidence. *Held further*, that such findings are regarded as influential in an appellate court, but they are not conclusive.

APPEAL from the Circuit Court of the United States for the Southern District of Georgia.

The case was argued by *Mr. Robert Toombs* for the appellant, and by *Mr. Benjamin H. Hill* for the appellee.

MR. JUSTICE CLIFFORD delivered the opinion of the court.

Peculiar as the controversy is, it will be necessary to make some reference to the pleadings, in order to understand its origin, and the precise character of the questions presented here in the assignment of errors.

Two of the complainants — to wit, Jeremiah Beall and William A. Beall — claimed, in the original bill of complaint, filed in the Superior Court of the State, to be joint owners with the other appellee, in equal proportions, of eight thousand six hundred and ninety-four bales of cotton; and the second complainant claimed that he was a joint owner with the aforesaid appellee, of the other parcel of cotton, consisting of one thousand one hundred bales : making, in all, nine thousand seven hundred and ninety-four bales of cotton, of the alleged value of $2,000,000. They not only claimed to be the owners of the cotton, in the proportions described, but they claimed that John Garsed and George Schley, therein named as respondents, had, at that date, commenced to seize and remove the same, for their own benefit, under some pretended military orders, and that Thomas S. Metcalf, the other part owner, was deterred, by fear of bodily harm, from making any effort to prevent such seizure and removal, or to join with them in asserting the plain and undoubted right of the described parties to the joint ownership of the property.

Suffice it to say, without entering into details, that the bill of complaint exhibits a detailed description of all the alleged

pretences, and proceeds to allege that the same, one and all, are without any legal or equitable foundation whatever.

Two other parcels of cotton, it is admitted, were sold by said Metcalf to the first-named respondent; but the complainants allege that he never possessed any authority to sell any portion of the cotton in question, and they aver that he never did make any offer of the same to the respondent. Voluntary recognition of the pretended contract being refused, the respondent applied to the military authorities of the district to enforce the same; and it appears that the military authorities decided that the cotton had been sold to the respondent, as he claimed, and that they promulgated an order that the supposed contract of sale should be carried into effect.

Sufficient appears to warrant the conclusion that it was under that order that the respondents commenced to seize and remove the cotton; and it appears that the complainants contested the legality of that order, and prayed the court in which the bill of complaint was filed to restrain and enjoin the respondents from removing the cotton, and from all attempts to take possession of the same, and to abstain from all interference with the cotton until the final hearing of the cause.

Pursuant to the prayer of the bill of complaint, a temporary injunction was granted. Service was made, and the respondents appeared and filed separate answers.

Ownership of the cotton, as alleged in the bill of complaint, is admitted by the first-named respondent; but he sets up the defence that he purchased the same of the other respondent, and that the other respondent was authorized to sell the same by Thomas S. Metcalf, who was one of the joint owners. Detailed reply to every allegation of the bill of complaint is set forth in the answer, which need not be reproduced.

Apart from that, the respondent first named prayed that he may have the decree of the court in his favor, and alleged that it was evident that a recovery of damages in a suit at law, for and on account of the breach of the contract committed by the complainants, would not be an adequate compensation for the non-performance of the same; and he also prayed that the complainants may be ordered, by the decree of the court, to perform the contract, and if any thing prevents it, that they may

be ordered, directed, and adjudged to respond in damages to the respondent, to an amount which will compensate him as fully as if specific performance of the contract had been completely carried into effect, and that the issues presented in the pleadings may be, fully and fairly, and without multiplication of actions, adjudicated between him and the complainants. Most of the allegations in the answer of the other principal respondent, so far as respects the pretended sale of the cotton, correspond with the allegations in the answer of the first-named respondent. Metcalf was also made a party respondent, and he appeared and filed an answer, in which he admitted, in substance and effect, that the allegations of the bill of complaint were correct.

Proofs were taken on both sides, but the counsel of the complainants, in vacation, before the cause came to final hearing, filed a motion in the clerk's office, dismissing the suit, to which motion the first-named respondent objected. Hearing upon the objection was had; and the court finally decided that the bill of complaint was properly dismissed, but that the answer of the first-named respondent, being in the nature of a cross-bill, must, under the law of the State, be retained for the purpose of adjudicating the question of relief prayed therein by that respondent in the original bill of complaint, and that he, the respondent, by those allegations, made himself complainant, and that the complainants in the original bill thereby became and are made the respondents, as in a cross-bill. *Attaway* v. *Dyer*, 8 Ga. 189; Code (Ga.), sect. 4181.

Due application was subsequently made by the complainant in the cross-bill, that the cause be removed into the Circuit Court of the United States; and the record shows that the motion was granted, and that the order of removal was carried into effect, so far as respects the cross-bill, as constituted under the decision of the State court.

New pleadings, in such a case, should have been filed in the Circuit Court, and such, it would seem, were the views of the appellees, as they submitted a motion that the cause be not entertained in the Circuit Court; but the parties subsequently entered into stipulations, in respect to the conduct of the cause, which authorized the conclusion that all such objections are

waived by the parties. Enough appears to warrant that con-
clusion, in the fact that proofs taken in the original suit were
in some instances brought forward by stipulation, and made a
part of the record in the Circuit Court; and in the more' im-
portant fact, that the parties made respondents in the cross-bill
appeared in the Circuit Court, and filed separate answers.

Reference will first be made to the answer of William A.
Beall. He alleges that all the cotton, except the one thousand
one hundred bales, was bought by Jeremiah Beall in his own
name, under an arrangement between the purchaser and the
other two respondents, that he, Jeremiah, should buy, store,
and control, and dispose of the cotton in his own name, as if
sole owner; that William A. Beall should negotiate loans for
all the money needed, except what the purchaser might ad-
vance; and that the other respondent should give credit to the
paper of the party contracting to furnish the money, or discount
the notes of his firm for that purpose.

Subsequently, sales of the cotton purchased were to be made
by the designated purchaser, as he should see fit; and the alleged
stipulation was, that the proceeds of the sale should be applied
to the extinguishment of the loans, and that the profits should
be divided equally between the parties. Sales sufficient to pay
all the loans contracted for the purchase of the cotton had
been made, before the present controversy arose, except the
advances made by the purchaser, and a few small debts, amount-
ing in all to about $200,000; and the same respondent avers that
his interest in the cotton, and that of the last-named appellee,
were only silent interests in the accounts to be rendered on final
settlement, the other party having the sole right and power of
purchasing, preserving, and disposing of the cotton in his own
individual name, as the sole owner.

Other defences are also set up in the answer, as follows: (2.)
That Schley was not the agent of Metcalf, nor of himself, nor
of the purchaser of the cotton;. nor was he himself or Metcalf
authorized to sell the same or any part thereof, nor to employ
or appoint a broker or agent to sell or dispose of the same.
(3.) That the appellant never purchased the cotton of any one,
and that he well knew that neither Schley nor Metcalf possessed
any authority to sell the cotton upon any terms whatever.

Separate answer was also filed by Jeremiah Beall, to the effect following: That all the cotton, except the one thousand one hundred bales, was purchased by him in his own name, and that it was in his sole and exclusive possession and control, and that neither of the other respondents had any authority whatever to sell or dispose of the same.

Appearance was also entered by Thomas S. Metcalf, in the Circuit Court, and he also filed an answer, in which he denied all the material allegations of the appellant in respect to the pretended purchase of the cotton, and averred, in the most explicit and positive manner, that he never offered to sell the cotton either to Schley or the appellant, as alleged by the latter in his answers to the original bill of complaint.

Voluminous proofs were taken by both parties in the Circuit Court; and on the 14th of May, 1869, it was ordered that the commission for taking testimony be closed, and that the cause be set down for hearing. Such hearing was subsequently had before the district judge, sitting in the Circuit Court; and he delivered an elaborate opinion, in which he discussed most of the matters of law and fact involved in the case, without announcing any final conclusion as to the rights of the parties. Instead of that, he entered an order in the cause, to the effect that certain prescribed issues, formally set forth in the transcript, should be tried by a jury, and prescribed certain rules and regulations to be observed by the parties in conducting the trial.

Pursuant to that order, a jury was subsequently called; and the transcript shows that the parties appeared, and that all the issues framed by the court were duly submitted to their determination. These issues were framed by the district judge, sitting in the Circuit Court; but the transcript shows that the circuit judge presided at the trial of the same, and that the jury, by their verdict, made a response to each issue. All of the findings were in favor of the respondents; and it appears that both the circuit and the district judges concurred in the final decree, which is, that the case be dismissed with costs, including the cross-bill. Immediate appeal was taken by the complainant, in the cross-bill, to this court.

Five principal errors are assigned, as follows: (1.) That the

court below erred in dismissing the case, including the cross-bill.  (2.) That the court erred in holding that there was no valid contract for the sale of the cotton.  (3.) That the court erred in holding that the code of the State required that the authority of the alleged agent must be in writing.  (4.) That the court erred in holding that the contract for the sale of the three parcels of cotton in this case was not an entire contract.  (5.) That the court erred in not admitting the statement of the agent to prove that he received authority from Metcalf to sell the cotton in controversy.

Years of litigation have ensued since the original bill of complaint was filed in the State court, but the court here is unanimously of the opinion that the decision of the controversy must turn chiefly upon the issues of fact involved in the pleadings; and in that view of the case it becomes necessary to advert, with some more particularity, to the preliminary transactions out of which the controversy arose.

Cotton in bales to a very large amount was collected under the orders of a Confederate officer, and was piled in certain fields adjacent to the city of Augusta, to be burned in case our army should approach that city.  Certain quantities of cotton belonging to the appellee Metcalf were collected for that purpose under those orders; but our army did not enter Augusta, and the cotton was left where it was deposited by the Confederate military forces.  Of course it was much exposed; and Metcalf and Schley entered into an agreement by which the latter undertook to remove as much of the cotton belonging to the former as he could, to a place of safety, and in consideration of such service he was to be entitled to one-third of the quantity so removed and saved.  Twenty-five hundred bales were, by that contract and one other of a like character, saved to the owner, he being entitled to two-thirds of the cotton saved by the other parties to the contract.

How much time was consumed in the operation does not appear; but it does appear that the appellant was in Augusta about that time to buy cotton, and that Metcalf and Schley agreed to sell to him the cotton belonging to them which was saved by that contract.  Schley and the appellant were acquainted; and it appears that the former offered the cotton

to the latter, and that the latter desired to purchase it if he could have some indulgence, which was finally given him by Schley, in pursuance of an arrangement between the owners of the cotton.

Beyond controversy, that matter was amicably arranged; and it was during one of these interviews that Metcalf informed the appellant of the existence of another large lot of cotton, stored in the name of another party, in the south-western part of the State, in which he, the informant, as he represented, had an interest, and which, as the informant believed, could be bought in cash for the same price.

Evidence was also introduced which shows that Metcalf handed to Schley a memorandum in writing, touching that large lot, and that the lot therein described contained nine thousand seven hundred and ninety-four bales, and that the same was deposited or stored at the several places named in the memorandum exhibited in the transcript. Appended to the memorandum was the following : " Believed to be in very good order as a whole lot, and to average five hundred pounds to the bale." Speaking of the bales, he says, " They belong to, and were bought by, a large planter in the south-west part of the State, and can this day be bought for twenty cents a pound in greenbacks. They are mostly crop-lots entire, and, therefore, are desirable for spinners, as cottons in that section are long-staple. There is not much doubt but that they can be had at that price a short time hence, if a buyer should come out with cash and go down and see the owner and the cotton."

Authority to sell the large lot, it is manifest, is not there conferred; but Schley sets up in his answer that Metcalf, when he handed him the memorandum, gave him verbal authority to sell the large lot also to the appellant, and that he afterwards, on the same day, agreed that the terms of sale should be the same as the terms for the other lot. Written proof of that allegation is not exhibited; and Metcalf denies, both in his answer and in his testimony, that he ever gave Schley any such authority, and insists that he handed him the memorandum merely as information, which he might show to the appellant, to let him know where and from whom the large lot of cotton could be purchased; and he denies also that he himself had

any authority to sell it, and he avers that he so informed Schley when he handed him the memorandum.

Opposed to that is the testimony of Schley; and it appears that his offer to the appellant was reduced to writing, dividing the cotton into three classes, in substance and effect as follows, stating in respect to class No. 1, that he controlled two thousand and eighty-nine bales of selected cotton, previously shown to the appellant, and which he offered to sell to him, to be reweighed and delivered at the gin-house where it then was, at twenty-five cents per pound, payable there in greenbacks; adding, " you have the privilege to the 6th of July to close the trade by telegraph," and that he, the seller, would wait for the money until he, the buyer, could reach there with it. What he said in respect to class No. 2 was, that he had six hundred bales of his own, of the same lot, which " you can have for eighteen cents in gold, payable here as soon as you can return with it." Both of those parcels were, undoubtedly, sold to the appellant, and they are not now in controversy.

Class No. 3 is in controversy, and in respect to that the same party stated, in the same communication, that he also controlled, and would have authority to sell by the 3d of July, nine thousand seven hundred and seventy-eight bales of cotton, stored as therein specifically described, and that he would sell the same, delivered where stored, at twenty-three cents per pound, — the cotton to be reweighed, and payable in greenbacks; adding as follows : " This purchase secured after I telegraph you." Late in the same afternoon Schley sent, by his servant, the following note to the appellant : " Since you left town I saw the party controlling the large lot of cotton No. 3, and it is agreed that if you telegraph to take it they will ratify what I have agreed," &c.

Three days later Schley informed Metcalf of the substance of the note sent by the servant to the appellant, and it appears that Metcalf promptly replied that he was misunderstood : that he had given no such authority. Whereupon Schley immediately sent a telegraph to the appellant, that he had misunderstood the parties in respect to lot No. 3, and requested him, if he still wished to purchase that lot, to say so by telegraph, and that he would answer if they would sell.

Conflicting testimony is exhibited in the transcript as to the precise period of time when the preceding telegram was received by the appellant; but it appears that he, on the 6th of the same July, telegraphed to his correspondent that he accepted lots 1, 2, and 3, and that gold and greenbacks would be sent by Adams Express in the next vessel, and directing his correspondent to forward the cotton. Schley, immediately on the receipt of that telegram, showed it to Metcalf, who repudiated so much of it as related to lot No. 3, and dictated the following answer, which Schley, without delay, sent to the appellant: "Parties owning the nine-thousand-bale lot refuse to sell unless the funds are here." "If here to-day, the bargain could be closed, and probably can be on your arrival."

Neither the gold nor greenbacks were shipped to pay for the three lots, as stated in the prior telegram; but it does appear that the contracts for lots 1 and 2 were subsequently closed, and that the amount was paid partly in money and partly in drafts.

Metcalf refused to deliver lot No. 3, and the appellant applied to the military authorities for an order to compel the delivery. Orders of the kind were at one time given; but it is unnecessary to discuss that topic, as the court is unhesitatingly of the opinion that the military authorities were entirely without jurisdiction in the premises, and that all such orders and the proceedings therein are absolutely null and void, which is all that need be said upon the subject.

Pending those proceedings, the original bill of complaint was filed, and the complainants obtained the writ of injunction, to which reference has already been made. On the 20th of September following all the military orders touching the cotton in controversy were revoked, and, four days later, the complainants proposed to dismiss the bill of complaint. Counsel were heard; and the court decided that the bill of complaint might be dismissed, but that the answer of the appellant must be retained, for the purpose and under the conditions heretofore sufficiently explained.

Controversies seldom arise where the proofs are more conflicting and irreconcilable than in the case before the court; and that remark applies with all its force to the testimony of

the parties as well as to many of the other witnesses.  Taken as a whole, the court here is of the opinion that the case is one where it was quite proper that the Circuit Court should invoke the aid of a jury in settling the controverted matters of fact.

Feigned issues were accordingly framed, and ten questions were submitted to the jury, all of which appertain to the material matters of fact in dispute between the parties, — the two great questions being as follows: (1.) Whether the appellant ever purchased lot No. 3, either of Schley or of the owners, or either of them.    (2.) Whether Schley ever had any authority to sell that lot, either from Metcalf or the other owners.

Presented as those questions were in every proper form to the jury, it will be sufficient to reproduce the findings of the jury without repeating the questions, except in one or two instances. Considering the importance of the first question, it will be given in the form exhibited in the transcript: —

1. Whether there was a sale of lots 1, 2, and 3, by Schley to Garsed; and, if so, whether the contract of sale was intended by the parties to be one entire and indivisible contract.

Responsive to that question, the jury found that there was a sale of lots Nos. 1 and 2, but that there was no sale as to lot No. 3; and if there was a sale of lot No. 3, Schley had no authority from Metcalf to make the sale, and that it would have been a separate, unauthorized, and distinct sale.

They also responded to the second question, and found that the contract was not entire, and that as to lot No. 3, it was never confirmed or ratified by Metcalf.

Part of the third question is equally important, and in response to that the jury found that lot No. 3 was never sold; and if so, without authority from Metcalf.  Consequently it was not sold at a stipulated price.  In response to the fourth question, the jury found that there was no time fixed for the delivery of the cotton.

Much less importance is attached to the fifth question, as it presents the inquiry whether the cotton was to be weighed or otherwise prepared for delivery; and the jury found upon that subject that neither of the parties was to prepare or weigh the cotton for delivery.  In response to the sixth question, that the cotton, so far as appeared, was never reweighed.

Inquiry was also made of the jury, in the seventh place, as to the market-price of cotton; and the jury found that a reasonable price at that time was eighteen or twenty cents per pound at the different localities.

Beyond all doubt, every one of the preceding findings of the jury tends more or less strongly to support the theory of the appellees; but the finding of the jury to the eighth question is even more conclusive that the claim of the appellant is without merit, as they find that Schley had no *verbal* authority from Metcalf to sell lot No. 3, and that it was not included in the sale of lots Nos. 1 and 2, and that the appellant, by virtue of his contract with Schley as to lots 1 and 2, neither accepted nor actually received any part of lot 3, or paid any part of the purchase-money.

Suppose the appellant never paid any part of the purchase-money for lot No. 3, still it was insisted that he offered to perform, and was ready to perform, his part of the contract; and, in order that that issue might be determined by the jury, the ninth question was framed, and it appears that the jury found, in response to that inquiry, that the appellant did not perform, or offer to perform, his part of the contract, and that he was never in a condition to perform it so as to entitle him to demand a delivery of the cotton; and they found, in response to the tenth inquiry, that he sustained no damages in relation to lot 3, upon the assumption that the findings are correct.

Costs were awarded to the respondents in the cross-bill; and the recital of the final decree shows that the parties were heard upon the pleadings and evidence in the case, and upon the findings of the jury rendered in response to the issues sent down to be tried at law, and which were duly returned to the Circuit Court sitting in equity. Error is not assigned in respect to that proceeding, and inasmuch as nothing is exhibited in the record to the contrary, the presumption must be that it is correct. Issues of the kind are properly directed, in a case where the questions of fact are involved in great doubt, by conflicting or insufficient evidence, and it is clear that the case before the subordinate court was one of that character. Adams's Eq., 6th Am. ed., 376; *Flagg* v. *Mann*, 2 Story, 387; *Field* v. *Holland*, 6 Cranch, 8.

Equity courts may decide both fact and law, but they may, if they see fit, refer doubtful questions of fact to a jury.   Findings of the kind, however, are not conclusive, and, if not satisfactory, they may be set aside or overruled; but if the finding is satisfactory to the Chancellor, the practice is to regard it as the proper foundation for a decree.   *Harding* v. *Handy*, 11 Wheat. 103.   Such findings are regarded as influential in an appellate court, but they are not conclusive.   *Goodyear* v. *Rubber Co.* 2 Cliff. 365; *Brockett* v. *Brockett*, 3 How. 691; 2 Dan. Chan. Prac., 4th Am. ed., 1072.   Consequently counsel were allowed to review the whole evidence in the case, and the court has followed the course adopted by the counsel at the argument, and the result of the review of the evidence is, that the court is clearly of the opinion that the findings of the jury were correct in all material respects, and that there is no error in the record.

*Decree affirmed.*