DEXTER & CARPENTER, Inc., v. HOUSTON et al.

Circuit Court of Appeals, Fourth Circuit.
July 5, 1927.

No. 2612.

1. Appeal and error ⊚⟟1008(1)—Findings and conclusions of trial judge are entitled to weight.

Findings and conclusions of trial judge, who heard case and had witnesses before him, are entitled to great weight.

2. Joint adventures ⊚⟟1—"Joint adventure" is special combination of persons for profit, without actual partnership relation.

A "joint adventure" is a special combination of two or more persons, wherein a profit is jointly sought, and partakes of nature of partnership, but does not have all its qualities.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Joint Adventure.]

3. Joint adventures ⊚⟟1—Coal wholesalers' agreement to lend money for third person's purchase of mine, in consideration of exclusive agency to sell mine's output, held "joint adventure."

Agreement between two coal wholesalers to lend money to third person for purchase of particular mine, in consideration of which they were to receive exclusive agency for sale of mine's product for two years, *held* a "joint adventure."

**4. Joint adventures ⊚�center4(1)—Agreement for joint adventure requires utmost good faith as between parties, and precludes either party from having hostile personal interest.**

When a joint adventure is once entered into, the utmost good faith is required as between parties, and neither can so act that his personal interest will be hostile to the other.

**5. Joint adventures ⊚�center4(1)—Coal wholesaler, purchasing mine after agreeing with another to loan money for purchase by third person in consideration of exclusive agency to sell output between them, held required to account for profits.**

Where coal wholesaler, after entering into agreement with another dealer to loan money to third person for purchase of mine in consideration of exclusive agency to sell output of mine between them, without knowledge of other party to such agreement, purchased the mine for itself and gave notice that original arrangement had fallen through, it thereby violated its obligation to act in good faith, and became liable to account for portion of profits.

**6. Corporations ⊚�center379—Incorporated coal wholesaler's agreement of joint adventure with another wholesaler to obtain exclusive agency for sale of mine's output between them held not ultra vires.**

Incorporated coal wholesaler's entering into agreement, of, joint adventure with another wholesaler, under which each was to loan a stated sum of money to a third person for the purchase of a mine, in consideration of exclusive agency for sale of mine's output between them, *held* not ultra vires.

**7. Trusts ⊚⟶17, 18(4)—Joint adventure agreement, imposing trust and partaking of nature of partnership, does not violate statute of frauds.**

Agreements of joint adventure, imposing trust and partaking of the character of a partnership, do not violate the terms of the statute of frauds.

**8. Joint adventures ⊚⟶4(1)—Rights of complainant under agreement of joint adventure held not lost by change of agreement without complainant's knowledge or consent.**

Rights of complainant coal wholesaler under joint adventure agreement with another wholesaler for loan of money to third person for purchase of mine, in consideration of exclusive agency for sale of mine's output between them, *held* not lost when agreement was changed by other party thereto without notice to or consent of complainant.

**9. Joint adventures ⊚⟶5(1)—Three years' delay in bringing suit for accounting after defendant's breach of joint adventure agreement held not laches, barring relief.**

Complainant's delay for nearly three years before bringing suit for accounting after defendant's breach of agreement of joint adventure *held* not laches, barring relief, in view of defendant's misrepresentations.

**10. Equity ⊚⟶71(2), 80—Delay must be consistent with reasonable diligence, or it will constitute "laches," though, if induced by misrepresentations, it is excused.**

Delay, in order not to constitute "laches," must be shown to be consistent with reasonable diligence, though, where actual misrepresentation, accepted in good faith, brings delay, it is excused.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Laches.]

**11. Joint adventures ⊚⟶4(4)—Coal wholesaler, required to account for portion of commissions on coal sold, held entitled to charge expense connected with sale of coal to Italian and United States governments as against claim that such sales involved no expense.**

Coal wholesaler, required to account for portion of profits or commissions from sale of mine's output, *held* entitled to charge expense connected with sale of coal to Italian and United States governments, as well as to other purchasers, as against claim that no expense, except filing of bid, was involved in such sales.

**12. Appeal and error ⊚⟶1017—Master's findings of fact are prima facie correct, and entitled to weight.**

Findings of master on questions of fact are prima facie correct, and entitled to weight.

**13. Joint adventures ⊚⟶5(1)—Coal wholesaler, required to account for portion of commissions on coal sold, held liable for interest from date of filing suit.**

In action against coal wholesaler to compel accounting for portion of profits or commissions on sale of coal after breach of agreement of joint adventure with another wholesaler, court properly exercised discretion in allowing interest on amount of recovery from date of commencement of suit.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Suit by W. W. Houston and another, late partners trading under the firm name of the Panhandle Coal Company, against Dexter & Carpenter, Inc. Decree for complainants (300 F. 354), and defendant appeals. Decree modified, and, as modified, affirmed.

Edward R. Baird, Jr., of Norfolk, Va., and Wm. B. Symmes, Jr., of New York City (Baird, White & Lanning, of Norfolk, Va., and Davis, Symmes & Schreiber, of New York City, on the brief), for appellant.

Gibbs L. Baker, of Washington, D. C. (Webb, Patterson & Hadley, of New York City, Willcox, Cooke & Willcox and Thomas H. Wilcox, Jr., all of Norfolk, Va., and Robert P. Patterson and Richard H. McCann, both of New York City, on the brief), for appellees.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

NORTHCOTT, Circuit Judge. This is a suit in equity, brought in the circuit court, city of Norfolk, Va., by W. W. Houston and Paul L. James, late partners trading in the

name of Panhandle Coal Company against Dexter & Carpenter, Inc., defendant, and afterward removed to the United States District Court for the Eastern District of Virginia.

W. W. Houston and Paul L. James were partners in the wholesale coal business, having offices in Norfolk, Va., New York City and Charleston, S. C., under the trade name of Panhandle Coal Company. Dexter & Carpenter, Inc., was also engaged in wholesale coal business, with offices in New York, Boston, Philadelphia, Baltimore, Altoona, Pa., and Norfolk. George M. Dexter was president and W. M. Carpenter, vice president of the company. Mr. L. H. Stone, of Cincinnati, Ohio, was vice president of the Jewett, Bigelow & Brooks Company, which company owned part of the stock of J. B. B. Coal Company. The latter company operated a coal mine in McDowell county, W. Va., in what is known as the Pocahontas field. The New England Fuel & Transportation Company, with office in Boston, owned or controlled a majority of the stock of J. B. B. Coal Company.

On July 19, 1920, Stone went to complainant James, whom he had known for a year or two prior thereto, at the office of the Panhandle Coal Company in New York and stated that he was engaged in an effort to buy the J. B. B. coal mine, and that he needed a certain sum of money in order to enable him to make the purchase. He proposed to Mr. James that, if he and his partner, Houston, would supply him with $200,000 cash, he would give them a contract for two years for the handling of all the output of the J. B. B. mine. At that time coal produced by the J. B. B. mine, which was of the best grade of bituminous coal, was in great demand on the market and brought a very high price; the coal market being unusually high. It was estimated that the output of the J. B. B. mine was in the neighborhood of 25,000 tons per month, or about 300,000 tons a year.

The proposition seemed attractive to James, and after discussing the matter with his partner, Houston, he decided to endeavor to secure another party to join with them in accepting Stone's proposition, and after approaching others went to the office of the defendant, took the matter up with that company, and invited the defendant to join them on an equal basis in accepting Stone's proposition. At a meeting the next day, at which Carpenter, James, and Stone were present, an agreement was entered into which resulted in the defendant giving Stone a check for $100,000, to be used in the purchase of the J. B. B. mine. Neither Dexter nor Carpen-

ter had known Stone before James took him to their office. The complainants were to advance an equal amount of money; the complainant and defendant jointly to have exclusive sale of the output of the J. B. B. mine, when purchased by Stone, for two years, and to receive thereon 8 per cent. commission. The $200,000 advanced to Stone was to be repaid, with interest, at the rate of $1 on each ton of coal sold. Stone then went to Boston, where the control of the stock of the J. B. B. mine was held, and found out that he could not make the deal with the amount of money he had; the complainants having given him $50,000 of their $100,000, with the understanding with Stone that the other $50,000 was to be paid when needed and within a few days. Stone then tried to reach James on the telephone, but did not succeed, but talked to Carpenter over the phone. Stone then returned to New York and had a conference, on August 3, with Dexter, president of the defendant company, and Carpenter. At this conference, Dexter and Carpenter agreed tentatively to provide the additional sum of money necessary to enable Stone to purchase the J. B. B. mine, in consideration of an interest in the stock of the coal company. Stone and Dexter returned the same night to Boston, where it developed that with the additional sum Stone's proposition could not be carried into effect.

After considerable bargaining, it was finally agreed by Stone, Carpenter, and Dexter that the defendant company should itself purchase the J. B. B. mine on an entirely different contract from that under consideration by Stone, and, on August 4, a contract was signed, between Dexter and Carpenter on the one hand and Stone on the other. Complainants, Houston and James, were not consulted about the new arrangement, but a clause was inserted in the contract, evidently at Stone's instance, stipulating what their interest would be under the new arrangement, and that, in the event the complainants failed to put up the additional $50,000, they should have the right to sell only one-fourth of the output of the J. B. B. mine. No demand was ever made on complainants for the additional $50,000. Under this contract Stone, for his service in bringing about the purchase, was to have an interest in the stock of the J. B. B. Company and was to be a director in the coal company when purchased. Stone and Dexter returned to New York, and on August 5, complainant James called at defendant's office and had an interview with Dexter. Of this interview Dexter testified that he had no recollection.

Defendant's officers promptly made an investigation of the property of the J. B. B. Coal Company. Dexter and Carpenter went to the operation and looked it over, and an inventory was made of the store and supplies. Dexter then went to Boston August 16, in company with his attorney, and closed the contract for the purchase of the property. There were a number of conditions changed before it was carried into execution, and on the 23d day of August, Dexter went back to Boston with Stone and concluded the purchase of the property along the outlines of the contract of August 16. On this occasion Dexter induced Stone to change the terms of his contract of August 4, giving the defendant by the change an option on the stock he (Stone) was to receive for the sum of $50,000. The complainants, Houston and James, had not been consulted or advised about any of the details of any of the various transactions after August 5, and, on August 17, James was in Cincinnati and called at Stone's office and learned the latter was going to Boston to complete the transaction. On his return to New York, James called up the office of the defendant on two different occasions, and was finally told that Stone had failed to purchase the mine, and that the defendant company had done so. On August 24, Dexter, as president of defendant, wrote complainants, returning their $50,000, and stating that Stone had failed to carry out his proposition, and that this was partially due to the fact that the complainants had not been able to make the additional $50,000 payment, and that the defendant company had decided, and completed arrangements, to purchase the property itself on lines under consideration before Stone had appeared. This letter further stated that some new arrangement for the sale of some of the tonnage of the J. B. B. mine would be discussed.

On receipt of this letter, Houston and James immediately called at the defendant's office and had an interview with Dexter, but nothing definite was decided, and no contract made fixing the status of complainants. Shortly afterward the defendant company turned over the J. B. B. mine to Dexter and Carpenter, individually, and in February, 1921, Stone was paid $50,000 due him, in lieu of his stock, under the option held by the defendant. Dexter and Carpenter, as owners of the coal property, shipped its output exclusively to the defendant, refusing to allow complainants any interest therein. Complainants did not learn that Stone was to receive $50,000 until some time in 1921. There was some talk between complainants and

Dexter and Carpenter from time to time as to some arrangements about the tonnage, but nothing definite was done, and in December, 1921, complainants wrote Dexter and Carpenter, asking for settlement of their interest in the proposition, to which defendant replied, stating that they knew of no interest that the complainants had, to which complainants answered, stating that this letter of defendant's indicated a change of attitude on part of defendant. In March, 1922, Houston, James and a Mr. Baker had lunch with Dexter, and the matter was discussed looking to settlement, but no conclusion was reached.

In July, 1923, this suit was brought. After hearing the District Judge found for the complainants, and on June 21, 1924, entered an interlocutory decree, referring the cause to a special master for the purpose of ascertaining the amount due complainants. The special master filed an able report covering the questions referred to him fully and finding for the complainants in the sum of $80,376.70, and upon hearing the District Judge confirmed the report of the special master, and in October, 1926, entered a final decree against the defendant in the sum of $80,376.70, with interest from the 11th day of July, 1923, the date of the institution of the suit and from this final decree this appeal was taken.

The first question for consideration is whether or not the agreement entered into between the complainants and the defendants, at the instance of Stone, constituted a joint adventure. There is considerable conflict in the evidence as to exactly what did happen at the various meetings had between the respective parties, covering the period of these negotiations, but there are written documents executed at the time which are illuminating. These written instruments, executed by the different parties at the time when their minds were not influenced by the thought of the result of litigation or of gain or loss, speak very clearly on this question. At the very first conference had with defendant's officers, $100,000 was put up by the defendant and receipt taken therefor, which receipt is as follows:

"Dexter & Carpenter, Inc., 12 Broadway, New York.

"July 31, 1920.

"Receipt is hereby acknowledged for one hundred thousand dollars ($100,000), as per check No. 2696 drawn on the National City Bank of New York, being payment made by us to you in connection with the Panhandle Coal Company, to enable you to secure the mines known as the J. B. B. Coal Company,

and in recognition of this the Panhandle Coal Company and Dexter & Carpenter, Inc., are to be the exclusive Eastern sales agents for the properties for a period of two years beginning August 1, 1920, on the basis of 8 per cent. of the mine's price of the coal. The Panhandle Coal Company and Dexter & Carpenter, Inc., are to share the tonnage and commissions equally. The repayment of this sum, with interest, to be on the basis of one dollar ($1.00) per ton of coal produced and shipped from the J. B. B. mines at Twin Branch. It is understood that, in the event that anything should happen whereby the proposed deal should not go through, the money is to be returned to us immediately.

"L. H. Stone."

This receipt was unquestionably drawn up in the office of the defendant and by its officers. The language is significant, and seems clearly to indicate a joint adventure between complainants and defendants in an effort to secure the exclusive agency, for a period of two years, for the output of the mine in question, the complainants and the defendant "to share the tonnage and commissions equally." It would be hard to conceive of language more clearly indicating a joint adventure, and the testimony of complainants with regard to what the agreement actually was is corroborated by the language of this receipt.

Complainant James brought Stone to defendant's office. Neither Dexter nor Carpenter had known Stone previous to that time. The proposition was so attractive to Dexter and Carpenter that without delay the large sum of $100,000 was immediately placed in Stone's hands, for the purpose of aiding him in the purchase of the mine. Complainants were to put up an equal sum, and were to share equally with the defendant in the profits arising, if the joint efforts were successful.

There is a conflict in the evidence as to whether or not complainants were to put up all of their $100,000 at once, or $50,000 of it at that time and the remaining $50,000 shortly afterward. On this point the preponderance of evidence was clearly with the complainants, but in any event it is admitted that no demand was ever made on complainants for the remaining payment, and it is equally clear that the failure of complainants to pay the remaining $50,000 in no way affected the negotiations of Stone for the purchase of the J. B. B. mine. Nobody knew this better than Dexter.

[1] On Stone's arrival in Boston he found that he could not effect the purchase as he expected with the money provided, and the contract of August 4 was entered into between defendant and Stone, which contract, speaking at the time of the transaction when the parties thereto had no thought of litigation, clearly recognized the interest of the complainants in the transaction, and speaks repeatedly of the use of complainant's money already paid or to be paid in completing the transaction upon the changed basis. All this was without consent of complainants, but it clearly shows just how the defendant's officers regarded the transaction at the time it was taking place. The learned judge who heard this case below had the witness before him in person, and the conclusions reached by him, reasons for which are so ably set out in his well-considered opinion filed herein (300 F. 354), are entitled to great weight.

"The findings of fact by the trial judge, before whom the witnesses appeared in person, are entitled to great weight, and will not be disregarded by the appellate court, unless they are manifestly erroneous." Bush v. Branson (C. C. A.) 248 F. 377; Hyman v. Directory, etc. (C. C. A.) 261 F. 991; Hamilton v. Young (C. C. A.) 285 F. 223; Garsed v. Beall, 92 U. S. 684, 23 L. Ed. 686.

The judge below holds that the evidence given by the complainant James as to the initial transaction is corroborated, and this we think clearly right, especially in view of the language used in the receipt above set out to the effect that the complainants and defendant "are to share the tonnage and commissions equally." This conclusion is also sustained by the provisions in the contract of August 4, between Stone and the defendant, manifestly incorporated in said contract at the instance of Stone, recognizing the right of the complainants to some interest in the changed transaction.

[2] "A joint adventure has been aptly defined as a 'special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.' * * * It is purely the creature of our American courts." 33 C. J. 841. A joint adventure has also been termed "commercial enterprise by several persons jointly." Joring v. Harriss (C. C. A.) 292 F. 974.

A joint adventure partakes of the nature of a partnership for a certain specific purpose, but does not have all the qualities of a partnership. "A 'joint adventure' may exist where persons embark in an undertaking without entering on the prosecution of the business as partners strictly, but engage in a common enterprise for their mutual benefits;

they each have the right to demand and expect from their associates good faith in all that relates to their common interests." Jackson v. Hooper, 76 N. J. Eq. 185, 74 A. 130. See, also, Reid v. Shaffer (C. C. A.) 249 F. 553.

In Van Tine v. Hilands (C. C.) 131 F. 124, an agreement to share equally commissions on the sale of certain stock was held to be a joint adventure. See also Berry v. Colborn, 65 W. Va. 493, 64 S. E. 636, 17 Ann. Cas. 1018.

[3] The complainants initiated this particular transaction, they and the defendant reached an agreement, to the joint enterprise each party agreed to contribute an equal sum of money, and the conclusion is inevitable that a joint adventure was entered into between the parties, the purpose being to secure the sole agency for the output of the J. B. B. mine, for the period of two years, complainants and defendant to share equally in the tonnage and commissions.

[4] "The adventure once entered into, the utmost good faith is required as between the parties, and one party is forbidden to so act that his personal interest would be hostile to the other." Maas v. Lonstorf (C. C. A.) 194 F. 577.

The joint adventure once being created by the mutual agreement entered into, there at once arose mutual obligations that the coadventurers owed to each other. As was forcibly said by the judge below: "So that, under the circumstances, there arose out of the agreement an obligation on the part of each of the parties to exercise toward the other the utmost good faith and fair dealing, and the further obligation on the part of each to protect the rights of the other equally with his own. This is fundamental."

Each coadventurer owes the other the duty of "utmost good faith and scrupulous honesty." Foster v. Callaghan & Co. (D. C.) 248 F. 944; Kimberly v. Arms, 129 U. S. 512, 9 S. Ct. 355, 32 L. Ed. 764. "Within the scope of the enterprise, they stand in a fiduciary relation to each other." 33 C. J. 851, and cases there cited.

The same rule of good faith required applies to the entire transaction once about to be entered into. "Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners. This obligation begins with the opening of the negotiations for the formation of the syndicate, applies to every phase of the business which is undertaken, and continues until the enterprise has been completely wound up and terminated." 33 Corpus Juris, p. 852. See, also, Selwyn v. Waller, 212 N. Y. 507, 106 N. E. 321, L. R. A. 1915B, 160.

"Whatever the relations of the parties may be, if they have united for a common purpose, they must be loyal to that purpose." Delmonico v. Roudebush (C. C.) 5 F. 165; Boqua v. Marshall, 88 Ark. 373, 114 S. W. 714; Frazer v. Linton, 183 Pa. 186, 38 A. 589.

[5] This obligation, in the nature of a trusteeship, the defendant did not fulfill; on the contrary, throughout the negotiations which resulted in the purchase of the J. B. B. mine by the defendant, instead of Stone, covering a period of 23 days, complainants were not once notified by the officers of the defendant as to the condition of negotiations, nor were they ever advised in any way or given an opportunity to participate in the changed transaction, and, on August 24, the defendant wrote the complainants the following letter:

"Dexter & Carpenter, Inc., 12 Broadway, New York.

"August 24th, 1920.

"Panhandle Coal Company, 32 Broadway, New York City—Gentlemen: Attention of Mr. James. As you know, the arrangement Mr. Stone proposed, regarding our each advancing $100,000 to enable him to purchase the J. B. B. properties, could not be carried out by him. This was partially due to you not being able to make the $50,000 payment due him and partially to other reasons which he has explained to you. Because of this, we have decided, and have completed arrangements, to purchase the properties on the lines we had under consideration before Mr. Stone appeared. We are therefore, as per our conversation with Mr. James, returning your $50,000 which Mr. Stone turned over to us to be returned to you, and will be glad to discuss with you some new arrangement for the sale of some of the tonnage, if it can be worked out.

"Yours very truly,
"Dexter & Carpenter, Inc.,
"G. M. Dexter, President.
"GMD:JC Enc."

From the evidence in this case, Dexter knew when this letter was written that the failure of complainants to furnish the additional $50,000 had nothing whatever to do with Stone's failure to buy, and that it did not have anything to do with such failure is clear from all the testimony in the case. Defendant in this letter tells complainants that they have purchased the property on lines had under consideration before Mr. Stone

appeared, yet in the contract of August 4, between Stone and the defendant, we find the following paragraph:

"Whereas, the first party induced the Panhandle Coal Company to advance said sums *and also brought about the agreement between the second party and the New England Fuel & Transportation Company,* and the second party has agreed that the first party shall receive as compensation for his services one-fourth (¼) of the outstanding capital stock of the Coal Company upon the conditions and terms hereinafter provided." (Italics supplied.)

This is an acknowledgement that Stone had brought about the sale to the defendant, and was receiving compensation for such service. How can these two statements, contained in these documents, for both of which the defendant is responsible, be reconciled? It should also be noted that in the letter of August 24, a promise was made to discuss with complainants some arrangement for the sale of the output of the mine, and as *vague and indefinite as this suggestion is,* it is proof that the officers of defendant company, recognized the fact that the complainants had some rights in the premises.

The defendant did not protect the interest of its coadventurers, did not carry the burden of good faith that rested upon it, but, on the contrary, emerged from the transaction with all the benefits of an extremely profitable enterprise, brought to their attention by complainants. The evidence shows that complainants would have been amply able, financially, to have carried their share of the changed arrangement.

[6] The adventure as agreed upon was clearly within the scope of the business carried on by the defendant, and it was within the authority of Dexter and Carpenter to enter into it. Defendant's business was the wholesaling of coal, and this was an agreement to get coal to wholesale. That Dexter and Carpenter, individually, had full control of Dexter & Carpenter, Inc., is shown by the fact that they afterward personally took over the mine purchased from the company and ran it at a large profit to themselves. Their act, when they entered into the agreement of joint adventure, was not ultra vires.

[7] Agreements of the character of this one, where the trust is imposed and the arrangement partakes of the character of a partnership, do not violate the terms of the statute of frauds. 29 Amer. & Eng. Ency. of Law, 897, 898; Miller v. Ferguson, 107 Va. 249, 57 S. E. 649, 122 Am. St. Rep. 840, 13 Ann. Cas. 138; Bond v. Taylor, 68 W. Va. 317,

69 S. E. 1000. In the latter case a compilation of authorities on this point will be found.

[8] The fact that the original arrangement had been changed without notice to the complainants, or without their being consulted, certainly could not deprive complainants of all their rights in the transaction. The defendant company took the place of Stone as purchaser, and knew of Stone's arrangement with their coadventurer, and thereby assumed Stone's obligation to complainants. The defendant recognized the existence of complainants' rights in the contract with Stone of August 4, and was bound to protect, as trustee, every right of the complainants. In the line of the authorities relied upon by counsel for the appellee, it will be found that the burden of good faith thrown upon a coadventurer was carried; but in this case we are forced to the conclusion that the defendant did not fulfill its duty to the complainants, and unless relieved by the act of the complainants themselves is bound to account for their share of profits made in the joint enterprise.

[9] A defense set up with great force by counsel for the defendant is that the complainants were guilty of laches, in that they rested upon their rights in waiting a period of nearly three years before bringing this suit, and that complainants are properly chargeable with all the information they could have received had they promptly investigated the situation upon the return of their money and notice to them that the transaction, as originally contemplated, had fallen through. In the absence of any misrepresentation on the part of the defendant or its officers, this would unquestionably be true, and the action of complainants would ordinarily be difficult to understand; but we find in the letter of August 24 a promise held out to complainants that some arrangement would be discussed, and the evidence shows that complainants took the matter up with defendant from time to time, hoping to secure some adjustment. It also appears from the evidence that full details of the transaction were never really given complainants until after the institution of the suit, and that the representations made to them were accepted in good faith, and were relied upon by them. We therefore hold that it would be unjust and inequitable, as is stated by the judge below, to deny them relief on this ground, if they are otherwise entitled to it. This is especially true where their delay has not operated to mislead or prejudice any one. Edwards v. Johnson, 90 S. C. 90, 72 S. E. 638.

[10] It is true that any delay must be shown to be consistent with reasonable diligence; but, where actual misrepresentation accepted in good faith brings about the delay, it is excused. "The generally accepted doctrine appears to be that laches is not, like limitation, a mere matter of time, but is principally a question of the inequity of permitting a claim to be enforced; this inequity being founded on some change in the condition or relations of the property or the parties. So long as parties are in the same condition, it matters little whether one presses a right promptly or slowly within limits allowed by law." 10 R. C. L. 396, and cases there cited; 21 C. J. 212-230.

In this case there was no change in conditions, or in the relations of the parties. The defendant was in no way prejudiced by complainants' delay in bringing suit and the rights of no third parties had intervened. "Lapse of time may be excused where complainants were unable to secure full information." 10 R. C. L. 402; 21 C. J. 219.

It has been held that, where one party misleads or the facts are concealed, laches is excused, and that even statutes of limitations do not run. For a compilation of the authorities on this point, see note to Shellenberger v. Ransom (Neb.) in 25 L. R. A. 564; Williams v. Bennett; 75 Ark. 312, 88 S. W. 600, 112 Am. St. Rep. 57. "There is no absolute rule as to what constitutes laches. * * * Each case is to be determined according to its own particular circumstances." 21 C. J. 217, and cases there cited under note 2. "A delay is excusable where it was induced by the adverse party; he cannot take advantage of a delay which he himself has caused or to which he has contributed. * * * *" 21 C. J. 243, and cases there cited under note 1.

Applying these principles, we are of the opinion that under the facts in this case the complainants are not to be denied relief on account of laches. It is charged that complainants waited to see whether or not the transaction would be profitable. The evidence shows that the coal produced by the J. B. B. mine was of the best grade and was easily sold throughout practically the entire period in question, and there was therefore no appreciable element of risk in the transaction.

Holding complainants entitled to relief, we now come to the question of the amount that should be allowed. The judge below held, in sustaining the report of the special master, that complainants were entitled, pursuant to the original agreement, to one-half of the commission that would have been earned from the sale of coal of the J. B. B. mine, during the period, at the agreed commission of 8 per cent., less a reasonable expense allowance for making such sale, and fixed the amount at $80,376.70, with interest from the date of the bringing of the suit. The master took a great deal of evidence, and his report is well considered. The report properly held that the change in the amount of commission made, by agreement between Dexter & Carpenter, Inc., and Dexter and Carpenter, individuals, as owners of the J. B. B. mine, without the knowledge of complainants, could not possibly affect complainant's interest.

[11] There is one point, however, upon which we cannot agree with the master's report and the holding of the court below, and that is the refusal to allow the defendant any expense connected with sale of the coal from the J. B. B. mine, applied on the contracts with Italian government and the government of the United States, contracts held by the defendant, and partly filled with this coal. The master disallowed this item on the ground that Dexter and Carpenter turned this coal over to themselves without expense. Certainly the defendant's organization, extensive as it was, consisting during the period in question, of from 42 to 46 employees, with its various offices and necessary expenses, was used in connection with these two contracts, and it must have been true that some expense attached to the sale of this coal. It is urged that all that was done to secure the United States government contract was to put in a bid, but certainly the defendant could not have been in position to do this, except for its organization. The Italian contract was signed on the same day that the purchase of the J. B. B. mine was completed, but in the securing of it and in its filling there must necessarily have been expense. The evidence is that it was more expensive to sell c. i. f. (cost, insurance and freight) coal than it was to sell any other class, and we cannot see why they should not have been allowed at least the same amount per ton for selling this coal that they were allowed for the other coal sold. The amount furnished on these two contracts was 107,226 tons, and at 15 cents a ton, which we think is the proper allowance for expense, as made by the master, under the evidence, makes an additional sum of $16,083.90, for which the defendant should have credit, thus reducing the amount decreed in one-half of that sum, to $72,334.75. In all other respects we agree with the judge below in confirming the master's report.

[12] Findings of master as to questions of fact are prima facie correct and entitled to weight. Medsker v. Bonebrake, 108 U. S. 66, 2 S. Ct. 351, 27 L. Ed. 654; Callaghan v. Myers, 128 U. S. 617, 9 S. Ct. 177, 32 L. Ed. 547.

[13] The learned judge below was clearly within the proper exercise of his discretion in allowing interest on the amount decreed, from the date of the commencement of the suit. "It is no hardship for one who has had the use of money owing to another to be required to pay interest thereon. * * *" Spalding v. Mason, 161 U. S. 375, 16 S. Ct. 592, 40 L. Ed. 738; Crescent Min. Co. v. Wasatch Min. Co., 151 U. S. 317, 14 S. Ct. 348, 38 L. Ed. 177. If the judge erred at all in the matter, it was in favor of the defendant, by not allowing interest from the time of the closing of the transaction.

Therefore the decree of the District Court will be modified, to the extent of reducing the amount awarded therein by the sum of $8,041.95—that is to say, from $80,376.70 to $72,334.75—and, as modified, the decree of the District Court is affirmed, the costs in this court to be divided.

Modified.