DOUGHTY et al. v. GRILLS et al.—260 S. W. (2d) 379.

Eastern Section. February 18, 1952.

Petition for Certiorari denied by Supreme Court, July 11, 1952.

Myron R. Ely, Thomas Thomson, Frank Flynn, Frank Creekmore and Richard Carson, all of Knoxville, for appellants.

Ward Hudgins, of Nashville, and Taylor & Badgett, of Knoxville, for appellees.

ANDERSON, P. J. The original bill seeks an injunction against the defendants, R. E. Grills and T. W. Wooten, restraining them from acting as "runners" and solicitors of personal injury claims against railroads on behalf of certain attorneys, particularly one by the name of Joseph B. McGlynn, of East St. Louis, Illinois.

Pursuant to a demand by the defendants, a jury was empaneled to try the issues of fact. To questions propounded, the jury answered that neither defendant had "solicited or recommended employment to any of the injured persons shown in the proof with respect to the settlement of their claims".

The Chancellor approved the verdict of the jury, and construing it as an exoneration of both defendants of the charges in the bill, entered a decree, dismissing the bill

and dissolving the temporary injunction theretofore issued. From this decree the complainants appealed.

The evidence in the case consists solely of testimony of witnesses introduced by the complainants. Neither defendant testified, nor did either offer any evidence in his behalf.

The complainants' first and principal contention is that the facts being uncontroverted, the Chancellor should have withdrawn the issues from the jury and decided the case himself, and, further, that since the undisputed evidence sustained the charges of the bill, he should have granted the relief sought by making the temporary injunction perpetual.

The defendants filed separate answers, in which they generally denied that they were guilty of any wrongful conduct in connection with the personal injury claims, or otherwise. The theory of the defense of the defendant Grills was that his activities in connection with personal claims against railroads were solely as the salaried representative of the Railroad Brotherhood and that he went no further than to advise injured members or the surviving relatives of deceased members of the fact that the Brotherhood maintained a Legal Aid Department, the services of which were available to the member or his said relatives, as it was his duty to do.

In his answer, the defendant Wooten denied that he had been guilty of any wrongful activities connected with the matters alleged in the bill, and answering further, said that from time to time he had been approached by injured members of the Brotherhood for advice as to what course they should take in the settlements of their claims against the railroad by which they were employed; that he had for many years known of the existence of the Legal Aid Department of the Brotherhood and when so approached

he advised the injured party or the relatives of the services available to them by reason of their membership in the Brotherhood; that "he has advised and encouraged the members of the Brotherhood to seek legal advice from the Legal Aid Department of the Brotherhood through the Brotherhood's regional counsel, Joseph B. McGlynn, East St. Louis, Illinois". He denied that he ever received any type of compensation from anyone seeking advice from him or from Joseph B. McGlynn, or any other person, and averred that his advice was given gratuitously because he considered it to the best interest of "his injured friends to seek the services of the Department (the Legal Aid Department of the Brotherhood)."

It was stipulated by the parties "that there had been no lawsuits filed in the circuit courts of Knox County, Tennessee, or in the Federal Court in Knox County, Tennessee, wherein a member of the Brotherhood of Railroad Trainmen had been injured, within the past ten years."

There was also a stipulation relative to a special circular issued by the Brotherhood of Railroad Trainmen, under date of August 15, 1930, requesting each lodge to designate a member whose duty it would be to submit to the Legal Aid Department preliminary reports on all cases of accidental injury or death to members of the Brotherhood, occurring in the course of their employment by the Railroad. The circular further called attention to the fact that it was the duty of the secretaries of all lodges to report on a form provided for the purpose to the Legal Aid Department each case where a member of their respective lodges was accidentally injured or killed while engaged in railroad service, giving if available the facts of the case, including the name and address of the member concerned, names and addresses of his dependents if the member were killed, the name of the

railroad, the time and place of the accident. It was further stated that "promptness in making these reports is very essential and therefore they should not be delayed awaiting the development of facts other than above stated".

A summary of the testimony of the material witnesses introduced by the complainant is as follows:

Mrs. John McMahan, widow of George Robertson, who was killed in 1947 while employed by the Southern Railroad, was manifestly a very hostile witness; so much so that the Chancellor allowed one of the counsel for the complainants to cross-examine her, notwithstanding that she was put on the stand by the complainants. She first testified that the defendant Wooten had come to her home to see her on one or two occasions; that prior to his first visit she had not known him; that he brought clothes and gifts for the children and advised her that she could get free legal advice, but that she did not remember the name of the lawyer he gave her. When counsel for the complainants was allowed to cross-examine her, the witness admitted, manifestly with great reluctance, that Wooten had told her to go to an attorney in St. Louis, from whom she could obtain free legal advice. Asked what was the purpose of a trip to St. Louis, the witness said, "I reckon I was supposed to see a lawyer for advice or something". Later in her testimony she said that Wooten told her about "the existence of this attorney" (in St. Louis), and that if she needed legal advice she could go there and get it for nothing. She also testified that Wooten said her expenses in going to St. Louis would be paid but he did not say who would pay them.

Carlyle Rader, former employee of the Southern Railroad, sustained an injury to his leg, and he went to East St. Louis, Illinois, and consulted Joseph McGlynn in that

city, and was sent by McGlynn to a doctor. He testified that neither of the defendants had anything to do with his going to East St. Louis; that he made that trip to see McGlynn because he understood that by virtue of his membership in the Railroad Brotherhood he was entitled to the free advice of one of its regional attorneys; that he paid his own expenses. Asked whether there was any arrangement as to his being reimbursed for his expense, the witness answered, "No arrangement at all unless I let them have the case". By "them" he said he meant McGlynn; that McGlynn advised him that he had been made a good offer of settlement and should accept it; that McGlynn made no charge for this service and did not take his case against the railroad.

J. H. Pinkston while working for the Southern Railroad sustained an injury to his leg. He testified that the defendant Wooten visited him while he was in the hospital; that he employed Joseph McGlynn of East St. Louis to represent him as his attorney in the prosecution of his claim against the railroad; that he did not talk to any lawyer in Knoxville about the claim; that before he went to East St. Louis he had a conference with the defendant Wooten and probably some others at the Andrew Johnson Hotel in Knoxville; that he did not remember for sure whether Wooten was there, but the others were "Mr. Allen Richey and Ed Hensley out of Chicago"; that Richey was a regional investigator for the Brotherhood and Hensley was a regional counsel "out of Chicago", but that he did not employ him; that McGlynn as his lawyer filed a suit in his behalf against the railroad, which was settled without a trial; that while in East St. Louis he consulted a doctor recommended by McGlynn; that he made four trips to East St. Louis to see McGlynn; that those trips were made in Mr. Richey's car; that the

witness further testified that he did not know any attorneys in Knoxville and asked his brother to have the defendant Wooten come to see him or send somebody to see him, and that was how he got in touch with Mr. Richey; that he knew about the Legal Aid Department of the Brotherhood and, being a member, he felt "they could give me advice, and they did, and they gave me a fair settlement and I was satisfied"; that the defendant Wooten never recommended any attorney to him, but that Richey did "after so long a time".

The witness further testified that while his suit was pending and before the settlement was effected, McGlynn gave him $100.00 a month "for a few months"; that McGlynn was reimbursed when the settlement was made; that he had a written contract with McGlynn to represent him for 25% of the amount recovered; that neither of the defendants solicited his claim against the railroad on behalf of McGlynn or anyone else.

L. B. Steele was injured while working for the Southern Railroad. He testified that he lived in Knoxville but employed Joseph McGlynn of East St. Louis, Illinois, to represent him as his attorney in the prosecution of his claim against the railroad; that he had known the defendant Wooten for a number of years and Grills for about a year, and knew the latter was a local investigator for the Brotherhood; that after his injury Grills came to see him at his request; that prior to his injury he did not know McGlynn but knew of him; that he went to East St. Louis twice, once by himself and once with Grills in the latter's car; that on McGlynn's recommendation he consulted Dr. Murphy, of East St. Louis, and he contracted with McGlynn to represent him for 25% of whatever was recovered; that no one suggested that he employ McGlynn and that he asked Grills to take him to

St. Louis; that Grills made no charge for taking him to St. Louis in his car.

Thomas W. Bailey was injured while working for the Southern Railroad. He testified he knew the defendant Wooten but did not know the defendant Grills; that he went to Wooten for advice about his claim against the railroad; that Wooten told him about the Legal Aid Department (of the Brotherhood), what they did and what he was entitled to from that Department; that he knew that Joseph McGlynn of East St. Louis was the attorney for the Legal Aid Department; that after talking with Wooten he went to East St. Louis and consulted with McGlynn; that he made two trips by himself and one with Mr. Rader in the latter's automobile; that Rader was a member of the Brotherhood, and charged him nothing for the trip; that when he consulted McGlynn, the latter sent him to a doctor, but he could not remember whether it was a Dr. Murphy, though it might have been; that he entered into a contract with McGlynn to represent him on the basis of 25% of whatever he recovered from the railroad; that a settlement was effected and McGlynn's fee and all expenses he had been put to were taken care of out of the settlement; that neither of the defendants nor anyone else suggested that he employ McGlynn to represent him; that he employed McGlynn because he had a good reputation among railroad men for treating them fairly and doing a good job for less money than a member of the Knoxville bar would charge; that pending the outcome of his case, McGlynn advanced him $100 a month as an unsecured loan, with the understanding that the loan was to be repaid out of the recovery from the railroad; that that was the only understanding he had had about reimbursing McGlynn for the amount so advanced.

J. P. Anderson was injured while working for the Southern Railroad. He testified that about a month after he was injured the defendant Grills came to see him and told him if he needed any legal aid, the Legal Aid Department of the Brotherhood would give it to him free of charge; that the Brotherhood had a lawyer in East St. Louis, Illinois, and that if he needed any legal advice that lawyer would give it to him without charge. He was asked by counsel for the defendant whether the defendant Turner Wooten ever suggested or insisted that he employ Joseph McGlynn as counsel in his case. The witness replied, "I don't think so, I don't recall it"; that he never employed anyone to represent him, but made a satisfactory settlement of his own with the claim agent of the railroad.

Fred T. Williams sustained an injury while working for the Southern Railroad. He was another manifestly hostile witness and the Chancellor allowed counsel for the complainants to cross-examine him, notwithstanding they had put him on the stand. He testified that he employed McGlynn to represent him in his case but that neither of the defendants had anything to do with that employment; that he learned of McGlynn through the secretary of the local lodge of the Brotherhood, who was at that time the defendant Wooten, and knew that McGlynn was the attorney for the Legal Aid Department, to whose services he was entitled free of charge.

John E. Anderson was injured in the course of his employment by the Southern Railroad. He employed Joseph B. McGlynn of East St. Louis to represent him; that he knew both defendants Wooten and Grills but had not talked with either before he employed McGlynn, that he made three different trips to East St. Louis; that on one of these trips the defendant Wooten took him and

loaned him the money with which to defray his expenses; that Wooten was reimbursed out of the settlement that he got with the railroad; that he also borrowed $300 from McGlynn before the settlement was made, which sum he repaid before his claim was settled. The witness further testified that he learned of McGlynn through a claim agent of the Southern Railroad Company who asked him not to employ McGlynn, that it is generally known in railroad circles that McGlynn "will do a good job for Railroad Brotherhood members for less money than they can get the job done elsewhere".

J. L. Fields lost his arm in an accident which occurred in the course of his employment by the Southern Railroad. He employed Joseph B. McGlynn, of East St. Louis, to represent him. He testified that he got the idea of employing McGlynn because the claim agent of the railroad was so anxious that he not do so; that he made two trips to East St. Louis to see McGlynn; that the defendant Grills took him one time in the latter's automobile and made no charge for the service; that Grills called him up (apparently from Nashville and said, "I am going Sunday (to East St. Louis), and if you want to go with me, why, come down and you can go with me"; that he traveled by bus from Knoxville to Nashville and hence to East St. Louis in the defendant Grills' car; that Grills did not urge or suggest that he employ Joseph B. McGlynn.

On re-direct examination, the witness was questioned particularly about the circumstances under which the defendant Grills arranged to take him to St. Louis. His testimony in this connection can best be made to appear by quoting from the record:

"Q. I believe I understood you to say that Mr. Grills called you up. Had you ever talked with Mr.

Grills about your claim before he called you? A. Mr. Joe McGlynn called me and told me, he says, 'I want you to come to St. Louis'. And then I got hold of— Mr. Grills called me and told me, 'I am going to St. Louis Sunday', and said, 'if you want to go with me come down and you can go with me'.

"Q. And up to that time, Mr. Fields, had you ever talked to Mr. Grills before about your claim? A. No, sir.

"Q. You don't know how Mr. Grills knew to call you from Nashville? A. Sir?

"Q. You don't know how come Mr. Grills to call you from Nashville, do you? A. No, sir, I couldn't say.

"Q. Do you know how come this East St. Louis lawyer to call you? A. Yes, sure. He called me because me and him were having the business. He was handling my claim for me. I had done signed up with him then.

"Q. Already signed up with him? A. Yes, sir. That was my second trip I went down. He called me.

"Q. But you had never talked to Mr. Grills before he called you on the telephone about your claim. A. No, sir.

"Q. And I believe in answer to a question asked by Mr. Hudgins, you said that Mr. Grills said, 'I am going to St. Louis'—or East St. Louis— A. Yes, sir.

"Q. '—and you can go along'? A. Yes, sir.

"Q. And that is the first conversation you had had with him? A. Yes, sir.

"Q. When you got into East St. Louis did Mr. Grills go to this lawyer's office with you? A. Yes, sir.

"Q. Was this lawyer and Mr. Grills acquainted?
A. I presume they was; yes, sir.

"Q. They did not appear to be strangers? A. No,
sir. Now that was the second trip I had went that we
are talking about.

"Q. Yes, but it was the only time Mr. Grills was
with you? A. Yes, sir, the only time Mr. Grills was
with me."

Charles Teague lost a foot as the result of a railroad
accident. He said that after he was taken home from
the hospital some man from "the Brotherhood" came to
see him; that it was not either of the defendants and he
did not recall his name; that he knew the defendant
Wooten, but did not know the defendant Grills; that at
the time of his accident Wooten was "local chairman"
and visited him a time or two, "just friendly visits";
that he did not say whether Wooten did or did not sug-
gest that he go to St. Louis because he could not remem-
ber; that in any event he did not go and did not employ
McGlynn or any other lawyer, but made a settlement with
the railroad. On objection of the defendants, all of this
witness' testimony was excluded.

Mrs. Clyde Large lost her husband as the result of a
railroad accident; she testified that she did not know
either the defendant Wooten or the defendant Grills;
but that she had in her possession a small paper bag
with the name of the defendant Wooten on it, but that
she was unable to explain where the bag came from or
why it was given to her; that about two weeks prior to
the trial, among the cards that came with the flowers for
her husband's funeral, she discovered a card bearing the
name of the defendant Wooten; that it was not the con-
ventional type of calling card but one about the size of a
post card, with Wooten's name printed on it in pencil;

that "Mr. Richey" got in touch with her and suggested that she go to East St. Louis to see a lawyer. On cross-examination she said the card was not addressed to her or to anyone else; that the only thing on it was the name, "Turner Wooten"; that she did not find the card until about two weeks prior to the trial when, looking through the cards that came with the flowers for the funeral, she discovered it and at the same time discovered the paper sack bearing the name of Wooten. On objection of the defendants, the Court excluded the testimony of this witness.

Charles L. Sauls sustained an injury in 1947 while working for the railroad. About six months later and while his claim was pending, he talked with Allen Richey about taking his claim to East St. Louis, Illinois; he testified that he knew the defendant Wooten, but never discussed the matter with him; that he, the witness, did not belong to the "Brotherhood"; that he did not know the defendant Grills. On objection, the testimony of this witness was excluded by the Court.

James Edward Luthke lost his arm in December, 1941, as the result of an accident which occurred while he was employed by the Southern Railroad. He said that some time thereafter the defendant Wooten came to his home to see him. Asked whether Wooten talked with him "in regard to taking your claim to East St. Louis", he answered, "Well, I am not sure whether Mr. Wooten came right out and in effect asked me to take my claim to St. Louis". He further testified that, "Mr. Wooten only told me about a Legal Department, which at that time, was represented by a Mr. Richey in this territory", and "he let me know that the Legal Department would handle my case", but did not state on what basis. Asked whether Wooten offered to take him anywhere with respect to

talking with a lawyer, he replied, "Yes, sir, he did"; and further stated that, "Two lawyers came down to the Andrew Johnson Hotel and I met them there"; that the defendant Wooten was also present; that these two lawyers were from out of town but he could not say whether they were from East St. Louis, and did not recall the name of either; asked what "these lawyers wanted to do", the witness replied, "Well, they thought I ought to sue the railroad company". He further testified that, "I had a good suit against them and they (the two lawyers) would like to have handled the suit and would have liked for me to sign up with them and sue against the Southern Railroad"; that they exhibited to him a contract, but he did not sign it; that they gave him to understand that the suit would be brought in East St. Louis, and that the defendant Wooten was present in the room throughout the conference.

On cross-examination, the witness testified that at that time Wooten was secretary of the local lodge (of the Brotherhood), and that he himself was a member. He was asked if Wooten did not tell him when he came to see him that he was entitled to the advice of the Legal Aid Department of the Brotherhood, and to this he responded as follows: "That is correct in a sense. He told me that they had a Legal Aid Department that would represent me against the Railroad Company if I so desired", but that he could not say that Wooten "told me or advised me to sue the Railroad Company, and at that time Mr. Allen Richey was the regional investigator (for the Brotherhood); that Mr. Richey gave him the same advice that Mr. Wooten had given him; that he did not know the defendant Grills and had never had any conversation with him about the matter.

Paul J. Kirby was injured three or four different times while employed by the railroad, the last time being in 1950. He employed Joseph B. McGlynn, of East St. Louis, to represent him in the prosecution of his claim against the railroad for the last mentioned injury. He testified that he had known about McGlynn for quite a while and of his own volition wrote to him about the employment; that he had never talked with the defendant Wooten, but had sent for the defendant Grills and talked with him. He volunteered the information that Grills "did not mention anything about going to St. Louis"; that "he was under the idea that I knew where to go"; he said that he did not recall whether he wrote McGlynn before he talked with Grills; that he understood that Grills was a "duly appointed officer of the Legal Aid Department", and that "if you needed advice or legal counsel, that it would be accorded you free of charge".

Counsel for the complainants made a valiant but unsuccessful effort to get the witness to say what Grills advised him to do in the course of the conversation. The witness was highly evasive; but upon cross-examination, he did say that Grills never suggested that he file a suit against the railway "through the office of Joe McGlynn".

All of the injuries referred to by the foregoing witnesses were sustained in Knox County, Tennessee, or in the general vicinity.

One of the witnesses, a member of the Brotherhood, testified that, "I paid for this Legal Aid business. I have every month. It is on my train receipt". Considering this testimony in its context and along with the other evidence in the case, the inference is justified that the Brotherhood collected monthly from its members, probably in connection with the collection of membership dues, a sum, in return for which the member in case of

an injury, or his relative in the case of his death, was entitled to the services of the Legal Aid Department, at least to the extent of being advised with respect to whether there was a valid claim against the railroad.

■ The complainants assign error on the action of the Court in excluding the testimony of the witnesses, Mrs. Clyde Large and Charles L. Sauls, the substance of which is above set out. The testimony of Mrs. Large was of no probative value and hence was properly excluded. Sauls' testimony we think was competent for a limited purpose on two grounds. The first is that it tended to show a pattern with respect to efforts to have personal injury and death claims against railroads sucked out of Knox County and channeled to out-of-state lawyers, particularly to McGlynn in East St. Louis. The second is that there was other evidence tending to show that of the two defendants, Wooten at least was cooperating with Richey, an investigator for the Brotherhood, in sending claimants to lawyers. Sauls testified that Richey urged or suggested that they go to East St. Louis to see a lawyer. Incidentally, it is significant that Sauls was not a member of the Brotherhood and hence was evidently not entitled to the aid of the Legal Department.

So, for the purposes indicated, the testimony of this witness is to be considered by this court along with all the other testimony in the case in determining whether the evidence justified the relief sought by the complainants.

■ We first consider to what extent the verdict of the jury in this kind of case is binding on this Court. This is strictly an injunction suit, that being the only relief sought. Hence, a court of equity alone having the power to grant the remedy of injunction, it is a purely

equitable proceeding. 1 Pomeroy, Section 221, p. 376; Gibson's Suits in Chancery, Sec. 25, and Sec. 804 et seq.

Such cases are not within the constitutional guaranty of trial by jury, and hence the rule that there can be no constitutional exercise of the power to direct a verdict where there is a dispute as to any material evidence, has no application. Hunt v. Hunt, 169 Tenn. 1, 80 S. W. (2d) 666; see also, Pass v. State, 181 Tenn. 613, 184 S. W. (2d) 1; Marler v. Wear, 117 Tenn. 244, 96 S. W. 447; Exum v. Griffis etc. Co., 144 Tenn. 239, 230 S. W. 601; Greene County Union Bank v. Miller, 18 Tenn. App. 239, 75 S. W. (2d) 49; and 19 Am. Jur. 272, Sec. 398.

In addition to holding that such cases were not within the constitutional guaranty of trial by jury with the consequences stated, the Court in the Hunt case also construed the statute providing for juries in chancery in its bearing upon the power of the chancellor to withdraw the issues in a case from a jury. Upon this important aspect of that case, the court said:

"It is to be observed that section 10574 of the 1932 Code departs somewhat from section 4465 of the Code of 1858 providing for juries in chancery. Under the new Code a party is not entitled to a jury in chancery 'in cases involving complicated accounting, as to such accounting' and in cases 'elsewhere excepted by law or by provisions of this Code.' So it is not every case in chancery in which a jury can be demanded and, the constitutional provisions not applying to cases of an equitable nature, the chancellor has a much broader latitude in withdrawing issues from a jury than the circuit judge does in directing a verdict." [169 Tenn. 1, 80 S. W. (2d) 669.]

Upon careful consideration of the entire opinion and the reasoning of the Court, it seems to us to definitely

hold that cases of purely equitable cognizance falling under the inherent jurisdiction of the chancery court, not only are not within the constitutional guaranty of trial by jury because of the fact that that guaranty refers to common-law actions only, but that they are within the exception to Code Section 10574 providing for juries in chancery,—that is, they are among the cases ''elsewhere excepted by law or by provisions of this Code''; and as a consequence of these views the familiar rule ''that the appellate court will not interfere if there is any evidence to sustain the verdict of a jury approved by the trial judge'', does not apply in weighing evidence in such cases.

The Hunt case was a suit to set up a trust in real estate, resting upon a parole agreement. There is no provision of the Code which excepts such suits from Code Section 10574 providing for juries in chancery. It is clear therefore that the inapplicability of Code Section 10574 to such suits is brought about by the phrase, ''elsewhere excepted by law'', and that this means by the common law. It can mean nothing else. In other words, as we read the decision in the Hunt case, by virtue of the language, ''elsewhere excepted by law or by provisions of this Code'', appearing in Code Section 10574, it is meant to exclude from the operation of that section not only those cases expressly excluded by some other provision of the Code, but suits in which under the common law a litigant was not entitled to a jury as a matter of right. This means that cases of purely equitable cognizance falling under the inherent jurisdiction of the chancery court are excepted because there was no right at common law to a jury trial in an equity case. Marler v. Wear, 117 Tenn. 244, 96 S. W. 447; Greene County Union Bank v. Miller, 18 Tenn. App. 239, 75 S. W. (2d) 49.

The present suit being one of that type, there was

neither a constitutional right nor a statutory right to a trial by jury; and hence the rules applicable in courts of equity, independent of the statute and the constitution, govern.

Where this is the case, the verdict is not binding on the chancellor, but advisory only. The responsibility of deciding the facts as well as the law is upon him. He may set the verdict aside, and order a new trial, or disregard it entirely, deciding the facts as though the issues had not been submitted to a jury; or he may give it such weight as it merits, approving it in whole or in part. On appeal, the verdict of the jury in such a case, while influential with the appellate court, is not conclusive. Note, 156 A. L. R. 1150, citing, among many from other jurisdictions, the Tennessee cases of London v. London, 20 Tenn. 1; Orgain v. Ramsey, 22 Tenn. 580; Lowe v. Traynor, 46 Tenn. 633; 19 Am. Jur. 277, 278, Sec. 404; Garsed v. Beall, 92 U. S. 684, 23 L. Ed. 686.

■■ Apart from this, however, since what we conceive to be the determinative facts are not controverted, there was nothing to submit to the jury. Therefore the Chancellor should have withdrawn the issues of his own motion and decided the case himself. Mutual Life Ins. Co. v. Burton, 167 Tenn. 606, 72 S. W. (2d) 778. Hence it becomes the duty of this Court to do what the Chancellor should have done—that is, to determine upon the record at large whether the complainants are entitled to the relief sought.

■■ The charge against the defendants is what is known in the common parlance of the profession as ''ambulance chasing''. There is no question about the propriety of injunctive relief if the evidence be sufficient. See Note, 14 A. L. R. (2d) 740. The term, ''ambulance chasing'', ''is generally used to designate the activities

of those laymen who acquaint themselves with the occurrence of accidents and .approach the injured persons or their representatives with a view toward soliciting employment of an attorney at law for the conduct of litigation arising from the accident". Note, 73 A. L. R. 401.

Such activities are not only prohibited by law, but are a violation of the canons of professional ethics adopted by the American Bar Association and by the rules of this Court and the Supreme Court. 185 Tenn. 889; 29 Tenn. App. 827, 847.

It is argued in the brief that the evidence is insufficient to show that either defendant solicited claims for or recommended employment of any lawyer. We think this contention not only overlooks some of the material evidence but overlooks the admissions of the answers. The two defendants set up somewhat different defenses. The defendant Grills avers that he is employed as an investigator by the Brotherhood of Railroad Trainmen and that it is part of his duty to investigate the injury or death of any member of the Brotherhood due to an accident while on duty with the railroad .and to report the facts to the Grand Lodge of the Brotherhood. He further avers that the Brotherhood maintains a Legal Aid Department whose services are available to all members and that said Department has various regional attorneys throughout the United States and that the regional attorney representing the State of Tennessee is Joseph B. McGlynn of East St. Louis, Illinois.

He further avers that in making his investigation it is a part of his duty to advise the injured member of the Brotherhood, or if deceased his representative, of the existence of.the Legal Aid Department, and the member's right to such services if needed and desired; that he always advises the members that it is optional with them

whether or not they avail themselves of the services of the Legal Aid Department and, further, that they are free to consult any lawyer of their choice.

The defendant then avers that for his services he receives a straight salary from the Brotherhood and that the members' action in choosing or rejecting the services of the Legal Aid Department is of no monetary value to him, and he receives no additonal monetary compensation from any member, lawyer or any other person.

When these averments of the answer are considered in the light of the evidence, they are practically an admission that in each instance investigated by him Grills recommends to the claimant that McGlynn be consulted, and the evidence shows that with one exception every claimant examined who consulted McGlynn employed him on a contingent fee basis to prosecute his claim against the railroad.

The defendant Wooten's defense as set up in his answer is somewhat different. In substance, it is that by virtue of his wide acquaintance among railroad employees in Knox County he was approached by members of the Brotherhood concerning claims against the railroad; that upon such occasions he did no more than advise them of the services available to them by reason of their membership in the Brotherhood, and encourage them to seek legal advice from the Legal Aid Department "through the Brotherhood's legal counsel, Joseph B. McGlynn, in East St. Louis, Illinois"; that for such advice and assistance which he gave to members of the Brotherhood he received no type of consideration from any source whatsoever. When these admissions are considered, it cannot, we think, be said that the defendant Wooten did not endeavor to send those having claims against the railroad to Mr. McGlynn. In a number of

instances those whom Wooten advised employed McGlynn on a contingent fee basis to prosecute their claims; and in at least one such instance Wooten took the claimant to St. Louis to see McGlynn and loaned him the money with which to defray the expenses of the trip. He also told one claimant that if she would make the trip to St. Louis her expenses would be paid.

We recognize that friends of a lawyer have a right to recommend him for employment and to turn his way such clients as they can persuade in a legitimate way to engage his services. Chreste v. Commonwealth, 171 Ky. 77, 186 S. W. 919; Ann. Cas. 1918E, 122. And judging from his answer, it seems to be the defendant Wooten's principal contention that that is all he did; that is, that he only advised those who approached him; that on such occasions "when his advice was sought he has advised and encouraged members of the Brotherhood to seek legal advice from the Legal Aid Department of the Brotherhood through the Brotherhood's regional counsel, Joseph B. McGlynn, East St. Louis, Illinois". Such is the averment of the answer. But it is not altogether borne out by the evidence. At least in one or two instances Wooten went to the home of the claimant and so far as appears, he went of his own volition. He also offered to take the witness Luthke to see a lawyer and this offer being accepted, took him to the Andrew Johnson Hotel, where he had a conference with two out-of-town lawyers who tried to get him to sign a contract employing them, with the understanding that suit would be brought in East St. Louis against the railroad. Wooten was present throughout this conference.

Wooten went several times to the home of Mrs. John McMahan, following the accidental death of her husband. Prior to his first visit, Mrs. McMahan did not know

Wooten at all, and so far as appears, he went of his own accord. He tried to persuade her to go to St. Louis to see a lawyer, from whom he told her she could obtain free legal advice, and that her expenses would be paid.

It is apparently the defendants' contention that they did not send claimants to McGlynn in order that he might be employed as an attorney, but only that they might receive the free legal advice to which they were entitled by virtue of their membership in the Brotherhood, or the membership of a deceased relative. This contention seems to postulate that when McGlynn was advising members of the Brotherhood or their representatives holding claims against the railroads, he was acting as counsel for the Legal Aid Department of the Brotherhood, and when he had finished said advice, he discarded his position as counsel for the Brotherhood, and assuming the role of an attorney, engaged in the private practice of law, negotiating a contract of employment when a cause of action was thought to exist, whereby the claimant employed him to prosecute his claim. The theory of the defense apparently is that for his "advice" to members he was compensated by the Brotherhood on a basis not disclosed, and for any further services such as effecting a settlement or procuring a recovery by suit, he received a percentage of the proceeds.

Even if this were a valid defense to the charge of the bill, the distinction is too fine-cut for us to adopt it under the evidence in this case. There is no evidence having any probative value to show what the relationship was between McGlynn and the Brotherhood, or upon what basis if any he was compensated by the Brotherhood for his services to members, or what services he was expected or obligated to perform for them. The mere statement of lay witnesses, without more, that he was

the regional counsel for the Legal Aid Department of the Brotherhood in a territory which included Tennessee, and that members were entitled to legal advice from him free of charge, means nothing from a probative standpoint, under the facts of this case. Whether testimony amounts to evidence that will support a conclusion, is a question for the Court. Cude v. Culberson, 30 Tenn. App. 628, 640, 209 S. W. (2d) 506, and cases cited.

None of the witnesses undertake to say just what they were to be advised about; but it is seemingly the theory that they were entitled to have the regional counsel advise them with respect to whether they had a cause of action against the railroad, or in case an offer of settlement had been made, whether it should be accepted. But one witness, Luthke, said that he was told by Richey, representative of the Legal Aid Department in the Knoxville territory, that that Department would handle his case against the carrier.

In passing, we may observe that if the defendants were referring claimants to the East St. Louis lawyer for advice of the nature referred to and not with the expectation that the lawyer would be employed, the arrangement was most unusual. it could only be accepted as true by one extraordinarily naive and unrealistic. For to get such advice it was necessary for the claimants to travel at their own expense from Knoxville, or its vicinity, to East St. Louis, and return, a distance of a thousand miles or more; whereas it is common knowledge that equally competent advice of the character described, if that were all that was sought, could have been obtained in Knoxville at an outlay not exceeding the cost of the trip to East St. Louis, and possibly less. In this connection, Mr. Justice Gailor, speaking for the Court, in a recent case made the significant observation:

"Where the testimony of an interested witness is incredible in the light of common knowledge and other circumstances, this Court is not bound to accept it." Dale v. Thomas H. Temple Co., 186 Tenn. 69, 87, 208 S. W. (2d) 344, 352.

But if the Legal Aid Department had the report of a departmental investigator about the accident, as Grills' answer avers, the question naturally arises as to why it was necessary for a claimant to go to East St. Louis to get advice from the Legal Aid Department, when, according to Grills' answer, the report would disclose all the pertinent facts necessary to enable the counsel to determine whether there was a cause of action.

No answer to this question can be found in the evidence. Whatever may be true about it, however, the fact remains that in the majority if not all of the instances dealt with in the evidence, the claimants sent to McGlynn wound up by employing him on a contingent fee basis to handle their claims against the railroads, and as a result, he either brought suit or effected a settlement, retaining a percentage of the proceeds for his services.

According to the evidence, McGlynn's activities in connection with claims against the railroads were well known in railroad circles. In recovering on such claims he had the reputation of being very successful; of "doing a good job for less money"; and the conclusion is inescapable that both defendants were well aware of the fact that claimants consulting him received not only advice but ordinarily employed him to handle their claims.

We have no doubt that in a number of instances these employments were the direct result of the activities of one or both of the defendants in sending the claimants to see McGlynn in East St. Louis. To hold otherwise under the evidence in this case would be to wholly dis-

regard the realities of common experience. It was through their efforts that McGlynn was put in touch with the claimants, and his employment as a private practitioner and not as a legal representative of the Brotherhood, was the result. Whatever his relationship to the Brotherhood, it did not justify the defendants in soliciting and sending claimants to him with a view of affording an opportunity for such employment.

Just here, it may be again noted that the witness, Sauls, with whom Richey talked about taking his claim to St. Louis, did not belong to the Brotherhood, and hence presumably was not entitled to the services of the Legal Aid Department. Evidence of Richey's advice to Sauls was competent against Wooten because, as already pointed out, testimony of other witnesses indicates that Richey held a position with the Brotherhood similar to that held by the defendant Grills and there is evidence tending to show that in some instances at least the defendant Wooten was cooperating with Richey in endeavoring to get claims against the railroads into the hands of a lawyer.

It may also be noted that there is no evidence whatever in the record as to what services the Legal Aid Department, through its regional counsel, performed, or was expected to perform, for the members, except the statement of some of the witnesses that by virtue of their membership in the Brotherhood they were entitled to legal advice from that Department. Such statements are mere generalities, obviously involving conclusions, and in this case are characterized by a vagueness which affords no sound basis for a decision as to the legitimacy of the defendants' activities. As already said, whether testimony rises to the dignity of evidence sufficient to support a conclusion, is a question of law for the Court. Cude v. Culberson, 30 Tenn. App. 628, 640 et seq., 209

S. W. (2d) 506, and cases cited; to which may be added, Moore v. Cincinnati, N. O. & T. P. Railroad, 148 Tenn. 561, 569, 256 S. W. 876; Stevens v. Mutual Protection Fire Insurance Co., 84 N. H. 275, 149 A. 498, 69 A.L.R. 624, 631; see also, 53 Am. Jur. 154.

It is true, there is no direct evidence in the record to show that either of the defendants received directly any compensation for sending claimants to McGlynn or other lawyers. But this was a matter peculiarly within the knowledge of the defendants and, if true, the burden was on them to show it. Cf. Schoolfield v. Bean, 26 Tenn. App. 30, 167 S. W. (2d) 359.

 The evidence considered as a whole, together with the admissions of the answers, showed prima facie that both defendants were engaged in influencing or trying to influence those holding claims against the railroads to put them into the hands of a lawyer, particularly Mr. McGlynn, of East St. Louis, and that this prima facie showing operated to shift to the defendants the burden of justifying their activities by showing them to be legal. Since the nature of their activities, their purpose and the facts and circumstances giving rise thereto, were peculiarly within the knowledge of the defendants, the facts that neither testified upon the trial, and neither offered any evidence to rebut the inferences which the complainants' evidence tended to establish, justified an inference that if the facts within the knowledge of the defendants had been made known, they would have supported the complainants' case rather than have rebutted it. The rule is stated in Fisher v. Travelers Ins. Co., 124 Tenn. 450, 486, 138 S. W. 316, 325, as follows:

"When a defendant can, by his own testimony, throw light upon matters at issue, necessary to his defense and peculiarly within his own knowledge,

if the facts exist, and fails to go upon the witness stand, the presumption is raised, and will be given effect to, that the facts do not exist.''

See also, Western Union Telegraph Co. v. Lamb, 140 Tenn. 107, 203 S. W. 752; Nat'l Life & Acc. Co. v. Morrison, 179 Tenn. 29, 41, 162 S. W. (2d) 501.

In the Fisher case, our Supreme Court goes thoroughly into the reason for this rule and its application. The quotation by the Court from one of the cases cited with approval seems peculiarly pertinent:

''It is a well-settled rule of evidence that when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion. 'It is certainly a maxim,' said Lord Mansfield, 'that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted.' Blatch v. Archer, Cowp., 63, 65. It is said by Mr. Starkie in his work on Evidence (volume 1, p. 54): 'The conduct of the party in omitting to produce that evidence in elucidation of the subject-matter in dispute which is in his power and which rests peculiarly within his own knowledge frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice.' ''
124 Tenn. at page 483, 138 S. W. at page 324.

The inference to be drawn from the failure of the defendants to testify or offer evidence in their behalf is in itself evidence and a potent factor in fortifying the prima facie case made by the evidence offered by the complainants, and when both are considered, we think the complainants were entitled to the relief sought against the defendants.

There is another theory on which the activities of the defendants are subject to be restrained by the injunctive processes of a court of equity.

As can be readily seen from the averments of the answers, the real defense set up by both defendants is, that their respective activities in trying to persuade claimants to consult McGlynn were justified by the facts that the latter was regional counsel for the Brotherhood, to whose legal advice members of the Brotherhood were entitled, and that in the case of the defendant Grills it was a part of his duties as a salaried representative of the Brotherhood to investigate accidents and advise claimants of their right to consult and receive advice from McGlynn in his capacity as a regional representative of the Legal Aid Department of the Brotherhood. As to the latter aspect of Grills' defense, we may say parenthetically that even if it were material in a determinative sense, there is no evidence in the record of any probative value to support it. Upon the other hand, the circular issued by the Brotherhood, hereinafter referred to, which was the subject of a stipulation by counsel, shows that it was the duty of the local lodge to report accidental injury to or death of members of the Brotherhood, sustained in the course of their employment by the railroad, and that it was the duty of the secretary of the local lodge to make the report to the grand lodge, showing the facts and circumstances of each accident; and this

stipulation is all there is in the record on the subject. Nor is there any competent evidence to show what the relation was between Grills and the Brotherhood, if any, or what his duties were if he was in fact employed by the Brotherhood. It is true that he so avers in his answer, but except as admissions against interest, the averments of pleading unsupported by evidence are of no avail.

As has been noted, Wooten in his answer also admitted that he advised and encouraged those holding claims against the railroad to seek the services of McGlynn as regional counsel of the Brotherhood.

If it be assumed as set up in the answers, that McGlynn was in fact regional counsel for the Brotherhood and that by virtue of their membership in that organization the members were entitled to legal advice from McGlynn, we think that fact would be no bar to the relief sought by the complainants under the showing made in the present case. This is true, because, *nothing else appearing,* the defendants would be aiding and abetting the illegal practice of law.

We have already noted that there was testimony justifying an inference to the effect that for the right to the services of the Legal Aid Department of the Brotherhood, including the "advice" of its regional counsel, the members of the Brotherhood periodically paid, presumably in connection with the payment of their dues, a sum of money the exact amount of which was not disclosed. The failure of the defendants to rebut this inference lends weight to the view that such was the case.

Giving legal advice constitutes the practice of law. People ex rel. Illinois State Bar Ass'n v. Peoples, etc., Bank, 344 Ill. 462, 176 N. E. 901; People ex rel. Courtney v. Association of Real Estate Taxpayers, 354 Ill. 102, 187 N. E. 823; In re Opinion of the Justices, 289

Mass. 607, 194 N. E. 313; Notes, 105 A.L.R. 1364, and 73 A.L.R. 1327; Goodman v. Motorists Alliance, 29 Ohio N. P., N. S., 31; Dworken v. Cleveland Auto Club, 29 Ohio N. P., N. S., 607; Fitchette v. Taylor, 191 Minn. 582, 254 N. W. 910, 94 A.L.R. 356.

A corporation cannot legally practice law, either directly or indirectly, by employing competent lawyers to practice for it. Re Co-operative Law Co., 198 N. Y. 479, 92 N. E. 15, 32 L.R.A., N. S., 55, 139 Am. St. Rep. 839, 19 Ann. Cas. 879; In re Otterness, 181 Minn. 254, 232 N. W. 318, 73 A.L.R. 1319; Seawell v. Carolina Motor Club, 209 N. C. 624, 184 S. E. 540; In re Maclub of America Inc., 295 Mass. 45, 3 N. E. (2d) 272, 105 A.L.R. 1360. Nor can a voluntary association practice law. Rhode Island Bar Ass'n v. Automobile Service Ass'n, 55 R. I. 122, 179 A. 139, 100 A.L.R. 226.

The Brotherhood is not a party to this suit, nor is Mr. McGlynn, and we, of course, do not undertake to make an adjudication binding upon them or either of them as to whether either or both were engaged in the illegal practice of law. It may be that if pertinent facts as to which the record is silent were fully developed, a conclusion different from that reached on this aspect of the case would be required. As to that, we cannot and do not undertake to say. We are obliged to reach a decision upon a consideration only of the record before us. In this plight of the case we hold no more than that the facts alleged in the respective answers of the defendants by way of justification for their activities in the particulars under consideration, viewed in the light of the evidence, constitute no bar to the relief sought by the complainants, but upon the other hand support the complainants' case for injunctive relief against the particular defendants. For, assuming without deciding that the facts alleged are

true, we think that *nothing else appearing* they constitute the illegal practice of law on the part of the Brotherhood and its regional counsel, and that the defendants were aiding and abetting that practice and hence subject to be restrained by the injunctive process of a court of equity.

The result is the Chancellor's decree is reversed and a decree will be entered in this Court granting the relief sought. The costs of the cause are adjudged against the defendants.